Good morning. Please be seated. Welcome to the Ninth Circuit. We're delighted to be with you today on our last day of arguments for this session. We have a pretty full calendar, so we are just going to jump right into it. We'll hear the cases in the order that they appear on the calendar. And the case first up is United States v. Mendiola. So if counsel is ready to proceed, we'll be delighted to hear from you. Ready to proceed, Your Honor. Good morning, Your Honors. May it please the Court. Joseph Horry representing the appellant, Floyd Mendiola. I'd like first, if possible, to reserve three minutes for rebuttal. First of all, I'd address the issue of the sentence. That's the simplest issue I think facing us today. The Court simply applied the wrong guideline. Well, hang on. Is this the, you're talking about the denial of the minor role adjustment? Yes. Isn't that moot, given that your client has been released, as I understand it? He has been released. He's been out for about two months now. Okay. So how could it still be a live issue for us? It's not moot where the Court can still, on remand, modify other conditions of the sentence, even if he served his full jail term. Yeah, but let's say that we agreed with you that he should have gotten, I guess, what And that would have resulted in a lower guideline range. Yes. So what, I mean, what benefit would that give him? Is there some concrete gain that he would get from that adjustment? Yes, it would. And this Court has addressed that issue on several occasions, including U.S. v. Allen, 434 F. 3rd, 1166. Did you cite that in your brief? No, I did not. New argument. This issue arose, the brief, when the brief was written, he was still in custody. So the issue had not come up at that time. I have not cited that in the brief. Okay, but tell me, what is that? The issue has arisen, but the point there is that where the Court, a sentencing issue is not moot, even though this full sentence has been served, even if it should have been lesser, if there are other conditions of the sentence that the Court can modify upon resentencing. Like what? That's what I'm asking. In this case, there are. In Allen, it was at the issue of supervised release. That could have been reduced. But here it can't be. Here it can't. It's a three-year. That's, so he doesn't have that. That's not going to change. So what would be different, even if we agreed with you on this point? The other thing that could be different is terms of the supervised release could be modified. Why would that be affected by whether he got a minor role adjustment? There are, it would be in the same sense that the Court has, would have discretion to modify that in the same way that it would the supervised release. Why would it turn on whether he got a minor role adjustment? I don't understand that at all. Do you have any case that says that? I have cases that say, including Gunderson v. Hood, that Allen part relied on, 268 F 1149, where it's possible for the Court to modify the conditions of supervised release, it is possible for some relief to be had, even if it's not the precise reduction of sentence that he originally sought. It's back on remand. The Court can modify other conditions that remain unsatisfied. Okay. And you gave us the sites just now to those bookcase cases. Did you advise counsel that you were going to argue something that's not in your brief and provide him with the citations in advance of this argument? No, I did not. Did you want to hold it a secret until now? Ordinarily, we'd get a better argument if you would advise him in advance of the cases so he could read them. It's a disservice to us if you do it otherwise. I'm sorry the Court feels that way, Your Honor. It's not a question of feeling that way. I like to make a judgment with everything before me. I understand. Okay. Could you write down, when you sit down, all of the citations, give a copy to counsel, and provide us with a copy? I will. Let's hear on the merits, then. On the merits, let me address the issue of the motion to suppress. First, the Miranda issue. There's no question the warnings were not given. There's no question that there was an interrogation. So the issue on which there's a dispute is whether the suspect was in custody. And the question there is that, judged on the totality of the circumstances, whether a reasonable person would feel free to leave. Now, there's two ways of looking at that, either one of which would lead to the conclusion that he was not. One would be to go through the so-called Kim factors, although they long predate the Kim case. But the factors, five factors, that this Court ordinarily looks at in that situation. And another would be to look at the Jacobs case that we've relied on from the Third Circuit, which is very closely similar on the facts. In fact, it's more similar on the Miranda issue than it actually is on the voluntariness issue. Well, it's a little different. That individual had been, in the Third Circuit case, he'd been a confidential informant for how long? Ten years. Ten years. How long had this person, your defendant, been a confidential agent? Just a few months. That is a substantial difference, isn't it? That is a difference. And that's a difference, though, that goes more towards the voluntariness issue than it does to the custody issue. And that's why I say, in fact, that it's more similar on the Miranda issue than on the voluntariness issue. With respect to the Miranda issue, you look at the Kim factors. Each of them, to the extent it applies at all, cuts either to a greater or lesser extent in favor of a determination of custody. The one that goes strongest in that direction is the second one, the extent to which the suspect is confronted with evidence of guilt. In this case, the whole meeting was one long confrontation with evidence of guilt. Another one leaning strongly in that direction is the fifth factor, the degree of pressure applied to detain. We have the pressure here to detain until he makes the admission. I think this is where... This is a case where he walks in of his own volition, he walks out of his own volition. That's... There's no indication I see here that he couldn't walk out any time he wanted to. Show me where your evidence is of that. Well, that's where I think the Jacobs case is most closely on point. As it points out in Jacobs, you don't come in freely when you're under the instruction that you must abide by the instructions of the FBI. He was under that instruction. So your client was told, as a condition, I guess, of being an informant or cooperating, that he was required to appear before these agents any time they summoned him? He was, yeah. He had the same instruction. Where does that appear in the record? I couldn't find that. Government's exhibit number two, the exhibit that was... Do you have an ER site? It was... It's around page... It's around page 388. It's within a couple of pages of that. It's in that exhibit. And that was the same instruction that was given to Jacobs. Well, I can see your point. If these people have something over them and the FBI is using them, and they may get a break and not have to go to jail, they're going to say... If they say, come in and see us, they're going to come in and see us. But what was the... Was there any substantial difference between the relationship in the Third Circuit case between the confidential informant and the police and the confidential informant in this one, other than it was just very short? It was short. I think the Jacobs... And just by virtue of being so much longer, there was more of a... Maybe more of a personal or more of a trust relationship that had built up in Jacobs than... That had not had time to build up in this case. That is a distinction. Yeah. But as Jacobs also pointed out, you're not free to leave. You don't leave freely when you're not free to leave until you answer the question. And the fact that after you answer the question and give the investigator what he wants, that you then can leave, does not mean that you reasonably feel free to leave while you're being questioned before you've given the answer. And also here, lurking in the background, which making this case a stronger case for custody than from the first meeting, you could be arrested. We could have you arrested. Am I under arrest, he asked? No, but we could have you arrested. So that's always looming out there as a threat. We could have you arrested if you don't cooperate. We could have you arrested if you don't participate as a confidential human... That probably wasn't news to him because he knew what he was doing, so he had to know that he could have been arrested, don't you think? That... I mean, he was specifically advised that by the officer. All I'm asking you is, was that news? I mean, you're emphasizing that he could have been arrested, but he had to know that he could have been arrested when he's breaking the law, don't you think? I suppose... On this record? As a hypothetical matter, I suppose he did, yeah. He'd been a police officer. We're not deciding hypothetical, we're deciding this case. So you can tell me on this case, didn't he know or didn't he... I mean, isn't the inference that he knew? I don't know what was in his mind before he got involved with the... All right. What we do know is he'd been a police officer for 12 years, so he certainly knows about Miranda. Well, he knows about Miranda. He got his Miranda card back at his first training and got the instructions. What he never had was any practical experience of that. He had no use of it. He never arrested anybody in 12 years. He never interrogated anybody in 12 years. That was not the kind of search and rescue as a ports police officer. He just was not involved in the side of it. In terms of interrogation and arrest, the most he was ever trained in was to the effect of put on the cuffs and wait for the real police to show up. They handled that and he never did handle that. Counselor, you're almost out of time. Why don't we stop, hear from the government, and we'll give you time on... Thank you. Good morning, Your Honor. Scarth Backey on behalf of the United States Appellees. I only have a couple of points and then I will... What's your position on the mootness issue? On the mootness... Your Honor, this is the first time it's being brought up. I mean, I don't... You knew he had been released. I did. Yes, Your Honor. Oh, you just... I don't know. I guess I would have thought... Maybe you would have advised us that  sentencing issue, at least, was moot and that we didn't have to waste our time with it and here are the cases that support that. But you're not prepared to address that at all right now? Oh, I can just follow up with what your question was. What you were saying, what term of supervised release could possibly be changed? And I don't think there is any one. No, no, no. So are you... All I ask is what's your position? And you sort of suggest you don't have one because you haven't thought of this. Do you have a position? Since I have not thought of it, I will return to the merits and just say that I think it can be resolved as briefed because I don't think it is a very close case. I mean, he literally distributed the methamphetamine in exchange for money. He is not substantially less culpable than the other drug dealers. There's only two participants here. So I think it's easier addressed on the merits because I don't believe it's a very difficult issue. Okay. What about the suppression motion? I disagree with him. I think the issue, if there is one, would be the voluntariness, not the custody. I think custody is not that close. Voluntariness, perhaps a little bit more. But the cooperation given by this defendant was about two and a half months, but more importantly, a total of about four hours of contact with this FBI agent. And another important part of this cooperation that leads into both custody and voluntariness is all of his cooperation was incriminating. Everything he provided tied back to him. And he specifically said, I don't want to deal or help with these people because I haven't called them in a long time. And that would be weird. So anytime he comes in or helps, it's going to implicate him in some crime. So, which is in stark contrast to Jacob's, where she's being confronted with a new crime that she doesn't know anything about. And I think that's a significant difference. Jacob is dissimilar for a number of reasons, but that's a very important one. When he was summoned that day, he had to have known he was going to provide information that incriminates himself. He was summoned in because his test was dirty on meth. And he disclosed that he was an informant. But isn't it during this time that you had this discussion with him as he listened to the tape? Yes, sir. But five total meetings, first one is initial contact. There's a second one that's not very helpful. There's the third meeting where he is signed up officially as an informant. That's where they go through the paperwork. They give him the admonishments. The exhibit, Your Honor, is 388. Yeah, I was looking at it. And there is an admonishment that says you, the person trying to cooperate, must abide by the instructions of the FBI. And he was instructed to come down there and answer questions. That sort of implies that until we are done questioning you, you're not free to leave, at least not according to our instructions, right? If memory serves me, the first admonishment is everything is voluntary. Right. You're right. That's number one. But number three says the CHS, whatever that stands for, cooperating something or other. The human source. Okay. Must abide by the instructions of the FBI. That seems pretty clear. If you volunteer to agree to cooperate, yes, then you must abide and tell the truth. Right. But the person, I mean, maybe as you said, it goes more toward voluntariness. But the person feels as though they've been told at the outset, as your opponent has mentioned, that we've got the goods on you. We could take you into custody right now. And so you're at their mercy. And they say, you come down here and answer our questions. I mean, do you think a reasonable person would feel free to just say, you know what? I'm out of here. And they're going to be allowed to leave after they've been told we'll arrest you unless you cooperate according to these instructions? I don't think the language was we'll arrest you unless you cooperate. We could arrest you and probably lead to an indictment and go through that process. But I don't think that that can be taken as you must come and answer all questions. And you can't leave. You're essentially detained until you do so. I don't think that that's a fair reading of that. Just that, yeah. I believe it's summoning. Summoning, perhaps, that yes, I'm asking you to come. You need to come. Answer questions, right? Right. I would agree that the arrival, perhaps, was pursuant to that language. But staying, answering questions, being truthful, that's where I think voluntariness is more important. No, I guess what I'm saying is that if the relationship is structured at the outset such that the person is advised, we can arrest you basically unless you're willing to cooperate. And the person says, okay, I don't want to be arrested. So I'll cooperate. And then you're told, okay, if you want to maintain your status as a cooperator, you must do X, Y, and Z. One of which is come down here and answer all of our questions whenever we summon you. Then doesn't, isn't the implication that, well, if I come down there and they start asking me questions I don't want to answer and I say, nope, I'm done, I'm out of here, that then your status as a cooperator has been terminated and now you're back into the, well, we can arrest you. I admit it's evidence on behalf of the appellant that it's definitely good evidence for him. But I think what you use the word implication. Here we have evidence that he remembered, I mean, I asked him to express me, do you remember being admonished that this is all voluntary? Yes. I don't believe there was any testimony elicited that he thought he had to abide by all the terms and conditions. I might be wrong about that. But I specifically asked, did you remember this is all voluntary? And he said yes. So I think that was in his mind when he arrived. He knew that he, we shouldn't speculate, we should go to this defendant who knew that it was voluntary. Why is your agent doing this? It's pretty offensive conduct, don't you think? No, I do not think it's offensive. So he decides that we're done with this person, no longer a cooperator, nothing that this person could say that's gonna in any way further the purposes of this agreement they've struck. Doesn't bother to tell him that. And then, what's the, I don't understand, why is that not offensive to you? Well, I mean, I'm a big believer in, you know, the Supreme Court. It's okay to extract incriminating statements from defendants through trickery and deceit. That's just how we, that's how we roll? That's your position here in Hawaii? No, we comply with the law and the Constitution. That's how, I guess, how we roll. But if it's, trickery is expressly permitted. And admissions of guilt are inherently, you know, desired. I mean, there's many pronouncements in the Supreme Court case law about the benefit to society for admissions of guilt, as long as they're not coerced. And this, we would submit this was not coerced. If you want to say it was trickery, that's fine. But you don't think it was trickery? You're not even going to concede that? I will concede that. That he was, he did not. I just, it's, I think it's offensive that the agent did this. I don't see, I mean, maybe you're right that the statements ultimately don't have to be suppressed. But I guess I share the District Court's sort of displeasure in seeing that this is how you all operate. If you want to get someone to cooperate, that's fine. There's all kinds of benefits that come from that. But if you then decided that you no longer have any use for someone, you know, don't use this device to come down and try to extract some incriminating statements from them. That just seems wrong. Maybe in some, you know, esoteric way, but not under the law, when it's expressly permitted under the law. And this Court has used the language, although reprehensible, it's permissible. Just, look, if you want to question the guy, say, come on down. Just to let you know at the outset, we're no longer using you as a cooperator, but we've got some questions for you, and maybe you can help yourself. Here are the tapes. That perhaps would be more fair, but again, it's not required. What in your view is the question before us today? Whether his statement was, I think the main and primary issue is whether his statement was voluntary. Let's say if he was in custody. Then it's suppressed. You? I would agree, because he's never received Miranda instruction. Yes, all right. Your Honor, if I may, the reason this was undertaken, and this is just a reality of law enforcement on Saipan, but we have about a 30% trial rate from indictments. We probably have, every trial participated in lasts a week. It's a knockdown, drag out fight, and we probably have about a 50% acquittal rate on top of that. So if we're going to go to trial, we want to have the best evidence possible, and we want it to be as direct as possible. The meeting on the 24th, they got into some incriminating statements, but the way it transpired with the phone ringing, he left early. They didn't get into what they wanted to get into originally, and this was a way to make his admission of guilt, to lock it down. If we're going to go to trial, let's have the best admission of guilt possible. That's why it was undertaken. All right. Well, I didn't mean to impugn the good people of Hawaii. I forgot. Saipan, Saipan. Yeah, yeah, yeah. I said Hawaii. That's my fault. With that, though, I have nothing else except if there's any other questions. Okay. Thank you. Thank you. Let's give two minutes for rebuttal to the defense counsel. No, thank you, Your Honor. I think the one thing that I may have inadvertently skipped over was the merits of the sentencing issue. When I said that the court applied the wrong guideline, the court looked to that language regarding used infrequently in extraordinary circumstances as being required to apply the guideline on a minor participant when, in fact, that has been taken out of the guideline. That was taken out by amendment in 2011. It's not there anymore. That's no longer the standard, so the court was applying a more heightened standard and a close question even under that standard. What do you think the narrow issue is before us for resolution? Do you think the narrow issue was whether you started off saying whether he's in custody was what you think? Do you think that's what the case turns out? I think that's at issue and also whether the confession was voluntary is also at issue. Two separate issues. With respect to the voluntariness, I know counsel just argued that trickery does not vitiate voluntariness, and he cited some cases to that effect. I think what we have here is not just trickery standing alone, however. I think what we have is we have a threat coupled with a promise coupled with the threat you could be arrested. That's the threat that's hanging over him throughout. But he was dealing meth. He knew he could be arrested, don't you think? I would say, Your Honor, it may be that no one of these things standing alone is sufficient to vitiate the voluntariness of the state. There's no doubt that you could be arrested right now. My reading of the record is that's no news to somebody who is dealing meth at the level your client was dealing meth. But this is on a condition, though, Your Honor. This is if you don't participate as a CHS, as the confidential human source. That's what's got him into this that's put him in there, and there's also an implicit promise. What got him in was that there was a desire to have some additional information as you go about convicting, and they caught him dead red-handed, and they indicated they would use him as an investigator. Isn't that what this record shows? Well, and that he, and that they represented to him that it would be to his benefit, and, you know, without... And for a while it was. ...a whole lot of specifics. It was on this record to his benefit. It was not to his benefit because it ultimately, it induced him to make this incriminatory statement which ended up being admitted. And so there's an implied promise that's inherent in that status that they gave him as the confidential human source, that by telling the truth, that by cooperating, that by going in and meeting them, by giving them what they asked for, that you're benefiting your own prospects. In fact, he was doing the opposite, and so, and that was done by the trickery, because they didn't tell him he had already been closed out as an informant. So you don't just have trickery, you don't just have a promise, you don't just have a threat. You have all three in combination with one another, and the result of that is his will being overborne. We've seen what his will was. His will was not... There's nothing wrong with, we've held that there's nothing wrong with trickery if you're dealing with suspected people who've committed felonies or other crimes. The only real issue we have here is, was he in custody when this happened? The district court, I thought, made a pretty good opinion that why he was not in custody, aside from what happened before and the rest of that, what is there specifically about this interrogation in this conference room that indicates to you he was in custody? When the officers specifically told him he was not in custody, and he came when he wanted to, and when he wanted to leave, they let him leave. Well, they may have told him that at some point. They didn't tell him that on the date we're interested in, which is the 4th of April. Those are the statements that we're seeking to suppress. Also, other things I would point out is that he went there to listen to some recordings. He had no indication that these were recordings of his own crimes. He found that out by surprise when he got there. The officers expressed their belief in his guilt. They believed that he was guilty. They expressed it to him. Those were important factors leading towards custody in Jacobs. They also go into this course. The voice on the tape was his. I understand what you're saying. They didn't say to him, we have recorded you, but he heard the voice. Do you think he didn't recognize that it was his voice that he was listening to? Oh, I think it was his voice, and he listened to it, and he didn't want to admit it was his voice. He resisted. But he did. Eventually, he did. His will was overborn. The first thing he said was, I don't know. I don't know what it is. I know the one voice. I don't know the other. And that was where he was going with it. He was asked, who are you trying to protect? He said, myself. His will was to protect himself, but it was overborn by the combination of the threat, the promise, and the improper inducement, and the trickery that was being exercised by the detective at that time. Okay. Thank you, counsel. The case just argued. We'll stand and submit it.
judges: Wallace, Farris, Watford